In re Dwayne Paul SCHYMA and Marjorie Jean Schyma, individually and d/b/a Schyma's Horse Ranch, Debtors.

Bankruptcy No. 5–84–326.

United States Bankruptcy Court,
D. Minnesota,
Fifth Division.

Dec. 9, 1985.

James L. Wiant, St. Cloud, Minn., for debtors.

Jean M. Didier, St. Cloud, Minn., for First American Nat. Bank of St. Cloud.

Albert E. Baddin, Duluth, Minn., Chapter 13 trustee.

## MEMORANDUM TO ORDER DENYING CONFIRMATION OF CHAPTER 13 PLAN

GREGORY F. KISHEL, Bankruptcy Judge.

The Court has this date entered an Order denying confirmation of Debtors' Chapter

13 Plan. Debtors' Chapter 13 Trustee has no objection to confirmation of the Plan as filed, and so advised the Court at the confirmation hearing held on March 6, 1985. However, First American National Bank of St. Cloud (hereinafter "First American"), one of Debtors' larger scheduled creditors, strenuously objected to confirmation; it ultimately argued six separate grounds for objection. The evidentiary hearing on First American's objections consumed the better part of a full day. The Court's request for briefing resulted in the filing of lengthy pleadings; First American's counsel's pre- and post-trial briefs and attachments totalled over 100 pages in length. The record on the confirmation issue [1] is massive, considering the relative size of Debtors' debt structure and the issues involved. In view of the large number of factual issues and First American's lengthy and involved objections, the Court is entering this Memorandum setting forth more extended Findings of Fact and Conclusions of Law for the benefit of the parties participating in the evidentiary hearing.

Debtors filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code in this Court on December 7, 1984. On that date, Debtors resided on a one-acre rural homestead in Foley, Benton County, Minnesota. Debtors' homestead was adjacent to the 160–acre "home farm" owned by Paul Schyma, Debtor Dwayne Schyma's 72–year-old father, and about three miles from a separate 60–acre cropland parcel also owned by Paul Schyma. (For the purposes of simplicity and clarity, the three Schymas will be referred to by their first names.) As of the date of filing, Dwayne was employed on a full-time basis in farming on Paul's home farm; Marjorie was employed on a full-time basis as a laboratory technician at St. Regis Paper Company, Sartell, Minnesota. Marjorie also engaged in horse raising and sales on Debtors' homestead property.

Debtors were married in August, 1971. Prior to their marriage, Dwayne lived with his parents and worked Paul's farm. The elder Schyma engaged primarily in dairy farming, growing corn and other crops to feed his herd and the hogs and other livestock which he raised as a sideline. While he lived with his parents Dwayne did not take a wage from Paul, though Paul gave him money for farming expenses and pocket money as he needed it. After Debtors married, they established a homestead on the one-acre parcel. Dwayne then entered into a different financial arrangement with his Paul. Both the elder and the younger Schyma designed this new arrangement to afford Dwayne sufficient income to maintain a separate household and support a family, and to allow Paul to continue farming into his elderly years without bearing the full burden of the labor involved. Basically, they agreed that Paul would continue to maintain a dairy herd and crops on the home farm. Dwayne would own and maintain the farming equipment necessary for

---

1. The Court has considered the trial testimony of both Debtors and First American's responsible loan officer, as well as the 27 trial exhibits admitted into evidence. The Court has also decided to incorporate into the trial record the transcripts of the depositions of both Debtors and Paul Schyma, Debtor Dwayne Paul Schyma's father. First American's counsel requested that the transcripts of these depositions and the transcript of the deposition of Theos Arthur Grove, First American's responsible loan officer, be taken into consideration. Debtors' counsel objected. The objection must be overruled as to the depositions of Debtors and Paul Schyma. Pursuant to BANKR.R. 9014, the Court directs that BANKR.R. 7032 will apply to the confirmation proceedings in this case. BANKR.R. 7032 makes FED.R.CIV.P. 32 applicable to these proceedings. For the purposes of the confirmation hearing, the Court considers both Debtors and First American to all be "parties" within the meaning of the Federal Rules. The Court also considers Paul Schyma to be a "witness" within the meaning of the Rules. FED.R.CIV.P. 32(a)(2) allows the depositions of both Debtors to be used by First American for any purpose; this obviously includes use of them to supplement trial testimony for purposes of decision on the merits. FED.R.CIV.P. 32(a)(3) allows the use of the deposition of Paul Schyma, as he was at a greater distance than 100 miles from the place of trial and, additionally, failed to appear in person to testify despite having been served with a subpoena to do so. The deposition of Mr. Grove may not be used for any substantive purpose, as he appeared at trial, testified, and none of the exceptions set forth in FED.R.CIV.P. 32(a) are applicable to him.

planting, cultivation and harvesting of feed crops, would do the bulk of the labor associated with these activities, would make hay for the herd's consumption either on the home farm or cooperatively with other farmers, and would assume more of the herd maintenance chores as time went on. From time to time Dwayne bred Paul's cows and kept the resulting calves for subsequent sale in the livestock markets. Paul retained ultimate authority over the breeding of the cows in his herd and generally allowed Dwayne to breed them and keep the offspring only when he did not wish to do so himself. Dwayne has not himself held or owned any calves so produced—or any other livestock—since early 1983. He last raised calves for market sale in 1982. He does not expect to raise calves under this arrangement in the foreseeable future and, if his Chapter 13 Plan were to be confirmed, he would lack the funds to raise them.

At no time did Paul place the record title of the farm real estate into any form of joint tenancy or tenancy in common with Paul. He contemplates eventually turning the entire farm and at least a portion of his herd over to Dwayne when he could no longer physically maintain the farm himself, evidently having concluded that Dwayne is the most worthy of his six children to continue the family farm because he had lived and farmed with his parents until he got married and still farms with them. At no time from 1971 until December, 1984, did Paul ever jointly incur any liability with Dwayne on any farm financing, whether as cosigner or guarantor. During the period from 1976 through 1984, Dwayne incurred fairly substantial secured debt for the purchase of his equipment and horses, principally to First American. At no time did any responsible loan officer at First American require Paul to cosign or guarantee any of Dwayne's obligations, though they were aware that father and son were jointly farming the same land.

As compensation for Dwayne's services, Paul shares the milk proceeds from the Ramey Cooperative Creamery with him. Under the Schymas' financial agreement,

Dwayne is entitled to one-third of each milk check as received, and is to be responsible for debt service on his own equipment. Paul has paid for most of the fuel and maintenance expenses for Dwayne's equipment, as well as for seed, farm insurance, and most expense incurred for feed when crops were not sufficient. From time to time, Paul has given Dwayne money to cover unexpected personal expenses or to make interest payments on his secured debt. They have generally termed these transactions "loans", though they have never agreed on specific repayment terms. From time to time Dwayne has "repaid" his father by giving him a share of the hay which he makes off the home farm, or by making small cash payments. Neither of the parties have kept adequate records of these transactions, and apparently neither treated these transactions as firm obligations giving rise to enforceable legal liability.

In March, 1976, Dwayne and Marjorie filed voluntary petitions under Chapter VII of the Bankruptcy Act in the United States District Court for this District and Division. At trial in the instant case, Marjorie alleged high medical bills as the main reason for this filing. Debtors' Schedules A–2 and B–2 in the 1976 cases alleged they held livestock and farming equipment "mortgaged to value" to the Production Credit Association of St. Cloud. Their Chapter VII Trustee did not try to establish that Dwayne and Paul were partners, nor to realize on any of Paul's property as it may have been used in their common farming activity. They received discharges in due course in December, 1977.

In 1980, Paul unilaterally decided to alter the method by which he had previously claimed income and deductions for tax purposes from his and Dwayne's farming operations. He now told his accountant, Richard Brenney, that he and Dwayne shared income. Apparently misunderstanding the ⅓–⅔ split, Mr. Brenney prepared separate individual income tax returns for Paul and Dwayne for tax years 1981 through 1983, reflecting an equal division

of income and interest deductions and describing Paul and Dwayne as "tenants in common".[2] Paul made this change at least in part from the belief that it would allow Dwayne to begin accumulating work quarters of coverage for entitlement to social security retirement benefits. There is no evidence that he or Mr. Brenney ever adequately explained the nature or implications of the change to Dwayne. When presented with these income tax returns, Dwayne did not inquire about their terms nor, apparently, did he even read them. He only signed them and mailed them to the appropriate taxing authorities.

At no time did Paul and Dwayne ever enter into any written partnership agreement governing any aspect of their farming activity. No evidence was produced at trial that they ever held themselves out as partners in such terms to any creditor entity other than First American; nor did they ever expressly hold out Dwayne as having an interest in Paul's real estate.[3] At times they physically mingled the livestock which they were maintaining. In 1982, Dwayne paid for and built a hog barn permanently affixed to the home farm and kept hogs in it for one or more seasons thereafter.

As a member of a cooperative creamery, Paul was and is entitled to receive yearly dividends if creamery income exceeds expenses. A portion of the earned dividend each year is applied to the purchase of additional equity in the creamery; only the remainder is distributed in cash to a member. Paul has shared this dividend with Dwayne in the past on the same ⅔-⅓ split as in the case of milk proceeds. In 1984 Dwayne's share of paid dividends was $77.45, a figure somewhat lower than in preceding years. The amount of paid dividends which Paul receives varies from year to year on an unpredictable basis; if the creamery has an unproductive year, members will not receive any dividend.

Though at one time Paul's herd was the highest-producing herd participating in Ramey Cooperative Creamery, from 1982 on its productivity dropped due to irregularity in the quality of feed grown by the Schymas, poor weather conditions, and a drop in herd size due to deaths among the yearly calf crops. At present, it does not appear that herd productivity or gross income will drop substantially over the three-year duration of Debtors' Plan. Based upon productivity during 1983 and 1984, Debtors estimate that Dwayne's gross income from farming (consisting of his one-third share of the milk proceeds) will total $11,975.00 per year. Based upon expense incurred over the 1983–84 period, they estimate Dwayne's share of milk-check deductions as follows:

| | |
|---|---:|
| Feed | $2,372.00 |
| Supplies | 1,148.00 |
| Tax | 40.00 |
| Fertilizer, seed, chemicals | 697.00 |
| MDP | 111.00 |
| Commodity Credit Corp. deduction | 476.00 |
| Total | $4,844.00 |

This results in yearly net creamery proceeds to Dwayne of $7,131.00, or an average of $594.25 per month. Debtors estimate machinery expenses for fuel, repairs, and contingencies at an average of $144.25 per month, resulting in average net farm income to Dwayne of $450.00 per month.

At trial, First American's responsible loan officer testified that he believed that the Commodity Credit Corporation deduction would terminate in April, 1985, resulting in approximately $40.00 of additional net creamery proceeds per month for Dwayne. Dwayne did not know whether this would occur.

2. For 1980 through 1983, Marjorie and Dwayne filed separate income tax returns. Apparently they did this to have Marjorie deduct losses attributable to her horse-raising activity against her employment income.

3. To the contrary, Mr. Grove was aware at least as early as mid–1980 that Dwayne had no interest in Paul's real estate. *See* Exhibit 10, Field Report of June 24, 1980. Two years later Mr. Grove noted that Dwayne and Paul were negotiating a sale of Paul's real estate and the "balance of cattle" to Dwayne. *See* Exhibit 7, Loan Application of February 19, 1982.

Marjorie received an average gross wage in 1984 of $516.10 per week, with average deductions for state and federal income tax and FICA withholding of approximately $149.00 per week. This results in a net weekly wage of $367.10. Calculated on the basis of 4.3 weeks per month, Marjorie receives an average net monthly wage of $1,578.53. First American's counsel questioned whether Marjorie would receive an increase in her wages in June, 1985, due to a step increase under her union contract. Marjorie's testimony on this issue established only that the papermill at which she was employed had recently changed ownership and that there was no certainty as of that date whether the new owner would follow the former owner's practice of negotiating a modest increase in employee wages and benefits upon expiration of the current union contract. Though Marjorie has had severe health difficulties in the past, she is at present in satisfactory health and expects to continue full-time employment during the pendency of Debtors' proposed Plan.

As a final component of income, Debtors include in their earnings for Chapter 13 purposes a monthly proration of their customary annual state and federal income tax refunds, which total $3,000.00. This would result in average additional monthly income of $250.00.

Debtors presently have five children, ranging in ages from four through twelve years. They heat their farmhouse using propane gas and make reasonable use of telephone and electricity, given their current family size and makeup and the location of their home. They currently belong to a horse breeding organization, certification by which maintains the marketability of the horses which they produce.

Marjorie presently commutes to and from her daily employment at Sartell, Minnesota; the one-way distance is 60 miles. None of Debtors' scheduled transportation expenses are excessive given Marjorie's weekly total commute of 600+ miles. Debtors' anticipated monthly living expenses over the pendency of their Chapter 13 Plan are as follows:

| | |
|---|---|
| Home mortgage payment (Federal Land Bank) | $552.00 |
| Utilities: | |
|   Electricity | 150.00 |
|   Heat | 225.00 |
|   Telephone | 50.00 |
| Groceries | 300.00 |
| Clothing | 40.00 |
| Laundry and cleaning | 10.00 |
| Medical and drug expense | 60.00 |
| Auto insurance | 18.37 |
| Casualty insurance | 30.38 |
| Transportation | 543.00 |
| Recreations | 30.00 |
| Club dues | 25.00 |
| Taxes | 18.00 |
| Stallion report fees | 8.00 |
| Total | $2,060.00 |

Debtors' anticipated total monthly net income is therefore $2,278.53, subject to a possible increase of $40.00 per month if the Commodity Credit Corporation deduction ceases. The excess of their estimated future monthly income is therefore about $218.00. In their Chapter 13 Plan they propose to make monthly payments of $200.00 to their Trustee for a period of 36 months toward unsecured debts which they estimate in the approximate amount of $67,600.00, resulting in a 9% dividend to unsecured creditors.

A summary of the property which Debtors held as of the date of filing, their exemption claims under 11 U.S.C. § 522(d), and the values which Debtors may properly claim as exempt for the purposes of §§ 522(b) and 522(f), is as follows:

Debtors arrived at the valuations placed on their property from personal knowledge and experience in livestock and farm auctions in Central Minnesota; their valuations are accurate.

Debtors' liability to First American arises under two different loan transactions, at least one of which was apparently refinanced on several occasions. Debtors' A-2 Schedule alleges the major debt to have been incurred on December 1, 1983, to be secured by all livestock and equipment (of a current value of $6,000.00), and to be

| Type of Property | Market Value | Value Claimed Exempt | Statute Creating Exemption | Value Properly Exempt |
|---|---|---|---|---|
| Homestead equity | $3,937.84 | $3,937.84 | §522(d)(1) | $3,937.84 |
| 1982 Chevrolet automobile | 4,000.00 | — | (d)(2) | [no equity] |
| 1978 Chevrolet pick-up truck | 1,000.00 | — | (d)(2) | [no equity] |
| Household goods, furnishings, personal clothing | 1,470.00 | 1,470.00 | (d)(3) | 1,470.00 |
| Jewelry | 25.00 | 25.00 | (d)(4) | 25.00 |
| Cash | 10.00 | 10.00 | (d)(5) | 10.00 |
| Wages withheld as of date of filing | 350.00 | 350.00 | (d)(5) | 350.00 |
| .22 rifles and scope | 150.00 | 150.00 | (d)(5) | [no equity] [4] |
| 8 horses | 905.00 | 905.00 | (d)(5) | — [5] |
| Unpaid income tax refunds | 3,000.00 | 3,000.00 | (d)(5) | 3,000.00 [6] |
| Farming equipment and implements | 5,175.00 | 5,175.00 | (d)(5) and (d)(6) | 1,500.00 3,675.00 |

in the current outstanding balance of $58,-554.91. They allege the smaller debt to have been incurred in 1983, to be secured by a 1978 Chevrolet pickup truck (of a current value of $1,000.00), and to be in the current outstanding balance of $1,800.00. Neither party introduced loan documents or testimony establishing precise balances on these debts. First American's timely filed Proof of Claim alleges a secured claim of $60,352.32, secured by "all livestock, machinery, equipment (including horses)" and alleges the value of the secured to be "in excess of $65,000.00". Debtors' Chapter 13 Plan proposes to treat First American's claim as a partially-secured claim after avoidance of First American's lien against its present collateral other than the 1978 Chevrolet pickup truck.

For about two years prior to the summer of 1984, Debtors participated in Credit Advisors, a private debt proration service from Minneapolis, and paid that agency substantial sums every month for distribution to their creditors. They discontinued participation only when First American advised them it would repossess its security due to their continuing default.

## DISCUSSION

The Court can confirm Debtors' Chapter 13 Plan only if all six of the tests under 11 U.S.C. § 1325(a) are met. *In re Bowles*, 48

4. Debtors' Chapter 13 statement and schedules allege that these guns and equipment are encumbered to Liberty Loan and Thrift for an amount in excess of their current reasonable value; since at first glance it would appear that this lien may not be avoided pursuant to § 522(f), there is no explanation for Debtors' claim of exemption in non-existent equity.

5. As noted *infra* at n. 10, Debtors probably cannot avoid the lien encumbering the horses.

6. There was no evidence as to Marjorie's intent to file separate income tax returns for 1984. In past years, she alone had tax withheld from her income and thus all income tax refunds were attributable to her alone. As such, any income tax refunds would be properly attributed to her alone for the $3,750.00 limitation on the "pourover" provisions of the § 522(d)(5) exemption—which would result in a somewhat greater share of the tax refunds being made available to a hypothetical Chapter 7 estate. Because of the lack of evidence, the Court has found the $3,000.00 in anticipated tax refunds to be Dwayne's and Marjorie's joint property, divided equally between them for the purposes of the § 522(d)(5) limitation.

B.R. 502 (Bankr.E.D.Va.1985). Debtors bear the initial burden of proving all facts to establish that the tests have been met. *In re Wolff,* 22 B.R. 510, 512–3 (Bankr. 9th Cir.1982). The Court will treat each of First American's six major objections individually.

### 1. § 1325(a)(4): "Best interests of creditors" test

First American's first and most complex objection arises under the following provision of 11 U.S.C. § 1325(a)(4):

(a) Except as provided in subsection (b), the court shall confirm a plan if—

.   .   .   .   .

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date ...

This language basically requires the petitioning debtor in a Chapter 13 case to afford his unsecured creditors a larger realization under a Chapter 13 debt adjustment than they would obtain in a hypothetical Chapter 7 liquidation case by the debtor. 5 COLLIER ON BANKR. ¶ 1325.91[2][D][b] at 1325–23 (15th ed. 1985). First American maintains that Debtors have failed to satisfy this so-called "best interests of creditors" test. It argues that Debtors have grossly undervalued their property on their bankruptcy schedules, and that they have failed to schedule and take into consideration an interest in all of Paul's real estate and herd which First American alleges Dwayne holds as a result of his financial relationship with his father.

■ The Court overrules the objection on the first ground. First American produced meager support for its challenges to Debtors' valuations of their 8–horse herd, their farming equipment and implements, their equity in the Ramey Cooperative Creamery, and their guns. Dwayne Schyma testified that he based his valuations for the horses, farming equipment, and guns on his personal knowledge and experience in attending farm auctions, selling horses, and generally being aware of advertised sale prices for used personal property in his area. The Court is well aware that, due to the depressed state of the agricultural economy, the current market for farming equipment and livestock throughout this state is poor. Sale and auction prices for these goods are low. The Bank's argument that, two to three years ago, Debtors insured some of these goods for higher values, or scheduled them on financial statements at much higher values, simply has no relevance to the present inquiry. Analysis under § 1325(a)(4) should use a current liquidation value of such property. *See* 5 COLLIER ON BANKR. ¶ 1325.91[2][D][b][iv.] at 1325–24 (15th ed. 1985). The Bankruptcy Code recognizes that value is not a constant in a complex economy, and that different theories of valuation may even be applied at different stages in a bankruptcy case. 11 U.S.C. § 506(a); S.REP. No. 95–989, 95th Cong., 2d Sess. 68 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854. The fact that a debtor valued assets differently in unrelated pre-bankruptcy Court proceedings or for other pre-bankruptcy purposes need not bind the debtor to the earlier valuations. *In re Norman,* 32 B.R. 562, 570 (Bankr.W.D.Mo.1983). The values which Debtors assign to these items are much closer to a realistic liquidation value than those which First American argues in conclusory fashion. First American produced no independent evidence of value other than the testimony of its loan officer, Arthur Grove. Mr. Grove testified only as to the current value of Debtors' equipment; his appraisal was neither as detailed or exact as Debtors' valuation, nor as credible given his relative lack of familiarity with the current condition of the equipment. First American's argument that Debtors hold valuable equity in the Ramey Cooperative Creamery is not supported by the record; nor does its allegation that Debtors failed to schedule this equity as an asset support any finding other than Debtors' or

their attorney's inadvertence or error. Dwayne's testimony established that the Creamery has not been able to issue substantial dividends to its members during the past year; thus, the value of the equity may be negligible at best.

First American argued the second ground for its § 1325(a)(4) objection much more thoroughly and persistently. It alleges that Paul and Dwayne have been engaged in a partnership for at least eleven years and, as a consequence of this relationship, all of Paul's property and all of Dwayne's property must be deemed as a matter of law to be property of the partnership. First American argues that, if Dwayne's partnership interest in all of Paul's real estate, personal property, and livestock were liquidated in a hypothetical Chapter 7 case, the resultant distribution to creditors would greatly exceed the proposed payment under the Plan—and, therefore, the "best interests of creditors" standard under § 1325(a)(4) would not be met. The Court concludes that First American has proven, as a matter of fact, that Paul and Dwayne have been and are partners in their farming activity. However, the evidence does not support a finding that either of them have transferred any of their separate, pre-partnership property into the partnership. As a result, Dwayne has no partnership interest in any of Paul's property and First American's objection fails on the second ground.

The Minnesota enactment of the Uniform Partnership Act, MINN.STAT. c. 323, governs this issue. Under the statute, the determination of the existence of a partnership is a factual question which must be decided upon all of the circumstances. MINN.STAT. § 323.06; *Cyrus v. Cyrus*, 242 Minn. 180, 183, 64 N.W.2d 538, 541 (1954). The statute defines a partnership as "an association of two or more persons to carry on as coowners a business for profit". MINN.STAT. § 323.02, subd. 8. MINN.STAT. § 323.06 sets forth several rules for guidance in the determination of the existence of a partnership. Those pertinent to this inquiry are as follows:

. . . . .

(2) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such coowners do or do not share any profits made by the use of the property;

(3) The sharing of gross receipts does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the receipts are derived;

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment

(a) As a debt by instalments or otherwise,

(b) As wages of a employee or rent to a landlord,

(c) As an annuity to widow or representative of a deceased partner,

(d) As interest on a loan, though the amount of payment vary with the profits of the business, or

(e) As the consideration for the sale of the good will of a business or other property by instalments or otherwise.

The Court may generally find the existence of a partnership where "the evidence as a whole reasonably shows that the parties have entered into a contractual relation whereby they have combined their property, labor, and skill in an enterprise or business as co-owners for the purpose of joint profit". *Cyrus* at 184, 64 N.W.2d at 541. The Court must consider the purpose for which a petitioning party seeks to establish a partnership. Specific indicia of partnership may be relevant where one of the alleged partners seeks to prove the existence of a partnership (as, for instance, where a post-dissolution division of partnership property is sought). The same indicia may not be relevant where a third party

seeks to prove the existence of a partnership (as, for instance where alleged partnership assets are to be reached for satisfaction of partnership debt to a third-party creditor). *Cyrus* at 183 n. 1, 64 N.W.2d at 541.

■ In the case at bar, the Court has determined that Paul and Dwayne were farming as partners. Plainly, they agreed to use their individual assets (Paul committing his real estate and herd, Dwayne committing his equipment), personal labor, and past experience for the generation of income for both of them. Neither of them held out the two as a partnership to any third-party creditor. (In this case, this factor does not bear on the basic existence of the partnership, but it does bear on whether an individual's property became partnership property.) For reasons not related to the daily conduct of their business, Paul claimed a partnership for income tax purposes. Dwayne acquiesced in this action, though more from ignorance and subservience to his father than from conscious deliberation. After some, but not all, production expenses were paid by deduction from milk proceeds, each party received a share of the profits. (For the purposes of MINN.STAT. § 323.06(3) and (4), this arrangement is a "share of the profits of a business", even though each party was responsible for expenses attributable to his own property after the division of milk proceeds.) Debtors conceded the existence of a partnership in their memorandum. Thus, the Court finds that Paul and Dwayne were partners.

However, First American's argument is fatally flawed in its assumption that both parties must be deemed to have contributed all of their individual farming-related property to a partnership entity. On this issue, MINN.STAT. § 323.07 provides in pertinent part:

> All property *originally brought into the partnership stock or subsequently acquired by purchase or otherwise,* on account of the partnership, is partnership property.
>
> Unless the contrary intention appears, property acquired with partnership funds is partnership property.

(Emphasis added.) In *Cyrus*, the Minnesota Supreme Court examined the question of whether one partner's pre-partnership real estate became property of the partnership. In connection with this issue, it noted:

> Whether real property acquired by a partner individually prior to the formation of a partnership belongs to or has been appropriated to the partnership is a question of intent. The fact that such realty is used for partnership purposes is not of itself, when standing alone, sufficient to establish an intent to contribute it to the partnership assets.

*Cyrus* at 187, 64 N.W.2d at 543. Though the *Cyrus* Court addressed only the issue of entitlement to real property, its reasoning is equally applicable to a case involving personalty.

■ The Court concludes that neither Paul nor Dwayne intended that their individual assets become the property of a partnership business entity, either at the onset of their joint farming activity or at any point thereafter. There was no evidence that partnership income was used for the purchase of jointly-held property prior to distribution to the partners. (There was some vague evidence of commingling of property, but this involved Paul's acquiescence to a trade-in of some of his equipment on a purchase by Dwayne.) First American produced no evidence that record title to real estate, equipment, or livestock was ever transferred into any form of joint ownership or ownership by a named partnership.[7] No evidence of pooling of funds

---

7. First American argues that Paul's decision to transfer his farm and herd to Dwayne at some unspecified future date demonstrates his intent to create a present partnership interest in his property. On its very face, Paul's testimony does not evidence recognition of a present joint ownership; rather, it shows only an intent to transfer a full ownership interest in the future. While Paul's deposition testimony was less than precise, it could be taken as an expression of a future intention to make either an *inter vivos* transfer or a testamentary bequest of his proper-

in a common bank account was introduced. At no time did either Paul or Dwayne ever hold himself out to any third party, creditor or otherwise, as creating any present partnership interest in his property. While Dwayne and Paul's tax returns alleged a partnership, they did so for specific (and probably erroneous) tax purposes. The tax returns are the only assertion of common ownership by the partnership. They are not binding on this Court and it deems them of minor consequence. The findings in this memorandum may have detrimental tax consequences to both Schymas, but that is of no concern here.

■ In short, the evidence compels the conclusion that, though Paul and Dwayne became partners for the conduct of common business and the sharing of resultant profits, they never intended to transfer any of their separate property to a partnership entity. They conducted themselves fully as if they each retained separate title to their individual assets. No third party ever relied on the existence of such partnership property interests in extending credit to either Schyma or both of them. Rather, the parties carried on their joint business using their individual property. Dwayne had no interest in a partnership holding ownership interests in Paul's farm and herd, and such a property interest can not be considered in the "best interests of creditors" test.

■ Applying the § 1325(a)(4) test, the Court holds that Debtors have satisfied it. Under the Court's analysis Debtors may properly exempt all of their property under the specific categories of § 522(d) or under the "pourover" provision of § 522(d)(5). If First American's lien against Debtors' horses is somehow avoidable, Debtors own property worth $7,940.00 exemptible under § 522(d)(5), subject to the aggregate limitation in a joint case of $7,500.00. At most, the value of non-exempt property available for administration in a hypothetical liqui-

dation would thus be $440.00. The total value of property to be distributed on account of all unsecured claims under the present terms of the Plan is $7,200.00, less trustee's fees and expenses of $720.00. The Court need not perform any extended calculations based on the claims as filed to conclude that First American and other unsecured creditors will receive more on their claims via the Plan than they would if Debtors' estate were liquidated under Chapter 7. This is so even if a discount factor of some magnitude were applied to the value of Plan payments on account of allowed unsecured claims as required under § 1325(a)(4). *See In re Hardy*, 755 F.2d 75 (6th Cir.1985).

*2. § 1325(b)(1): Application of All of Debtors' Projected Disposable Income.*

First American's second objection is premised on the following language of 11 U.S.C. § 1325(b)(1):

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

This provision was added to Chapter 13 by the Bankruptcy Amendments and Federal Judgeship Act of 1984. As Debtors filed their Petition after the effective date of the non-jurisdictional amendments in that Act, this language is applicable. Pub.L. No. 98–353, § 553(a), 98 Stat. 333, 392 (1984). Given the recent enactment of this provi-

---

ty. Paul's statements are more appropriately classified as a crude informal estate plan. His prior lack of readiness to make an *inter vivos* transfer to Dwayne was probably borne of cau-

tion—and, probably, not unwise given Dwayne's financial misfortunes and two-time status as petitioner in this Court.

sion, reported case law construing it is still scarce.

█ Under the express terms of Debtors' Plan, First American is or will be the holder of an allowed unsecured claim and, as such, it has objected to the confirmation of the Plan.[8] It correctly points out that the value of the property which it would receive under Debtors' Plan is substantially less than the amount of its allowed unsecured claim. It then argues that Debtors have failed to provide that all of their projected disposable income to be received in the three-year period commencing on the date of their first Plan payment will be applied to make payments under the Plan. First American argues that Debtors have failed to apply all of Marjorie's projected disposable income, by alleging that her payroll withholding taxes are overstated by approximately $12.00 per week, and that the Plan fails to consider wage increases which may be forthcoming. As to Dwayne's income, First American argues that the Plan fails to apply a number of additional factors which would increase his scheduled income and the applied disposable income. While First American has shown that Debtors have not calculated their disposable income with utter precision, the Court concludes that it has failed to establish sufficient grounds for objection under § 1325(b)(1).

First, the language of § 1325(b)(1) indicates that Congress intended to grant a discretionary or permissive power in the Court to refuse "approval" of the Plan, rather than to mandate denial of confirmation. *In re Otero,* 48 B.R. 704, 708 (Bankr. E.D.Va.1985).[9]

█ Second, the various line items which First American uses to support its argument are either inappropriate or *de minimis.* Application of the allegedly-correct measure of payroll withholding for taxes to Marjorie's income and omission of the Commodity Credit Corporation deduction from Dwayne's milk proceeds would increase Debtors' income projections by, respectively, about $50.00 and about $40.00 per month. Marjorie is not guaranteed step increases in her wages over the duration of the Plan; in any event, as noted *infra* in section 6, the Plan may be subject to modification on motion of the Trustee if she gets such increases. Similarly, the prospect of dividends from the Ramey Cooperative Creamery is not so certain as to require Debtors or the Court to consider them as regular or disposable income. The receipt of sporadic gratuitous assistance from Paul is not, of itself, regular or disposable income for Chapter 13 purposes. *In re Campbell,* 38 B.R. 193, 196 (Bankr.E. D.N.Y.1984). Dwayne's farm income has dropped to a lower but apparently stable level due to various factors; thus, the use of his lowest annual dairy income factor for the past four years is not inappropriate. Dwayne has not raised livestock for sale for nearly two years; practically speaking, he cannot afford to do so now. Thus, he need not include livestock sale proceeds in his projected disposable income. Lastly, derivation of interest income from savings investment during high-income periods is simply not practical for these Debtors— and, even if applied, it would generate a relatively minimal amount to apply to the Plan.

In short, even were First American's suggested enhancements of Debtors' dis-

8. Strictly speaking, First American's claim should be considered as a fully-secured claim on the basis of its Proof of Claim and Debtors' failure to file an objection thereto. 11 U.S.C. § 502(a); BANKR.R. 3001(f). This would deprive First American of standing as an unsecured creditor. Debtors' Plan proposes to treat the majority of First American's claim as unsecured, however, and they did not object to First American's standing as such; for the purposes of this inquiry, the Court will therefore overlook a paper defect to reach the merits. First Ameri-

can may elect to amend its Proof of Claim to avoid confusion over its entitlement to distributions when the Trustee commences them.

9. Nowhere else in Chapter 13 is the term "approve" used in relation to Court review of a plan. Congress may well have meant "approve" to be the equivalent of "confirm" but, in the haste which apparently surrounded the passage of the Amendments Act, neglected to use uniform and precise terminology.

posable income well-founded and applied, they would generate no more than about $100.00 of additional disposable income per month. Given Debtors' family size and composition, the age of their vehicles and equipment, and the likelihood of unexpected emergency expenses for which no provision has otherwise been made in Debtors' Plan, the Court cannot conclude that Debtors' Plan violates the spirit of § 1325(b)(1). In *Otero*, the Court noted that a surplus of $117.00 per month after payment of living expenses and the Chapter 13 obligation was "not a significant or substantial amount to be extracted from the debtors". The Court went on to pithily note:

> It was not intended to take the last son. A cushion of money is necessary in Chapter 13 budgeting to guard against life's unexpectancies. It is not in the public interest to squeeze the last dollar from Chapter 13 debtors to fund a Chapter 13 plan.

*Otero* at 708.

### 3. § 1325(a)(5): Treatment of First American's Secured Claim in Plan.

First American's third objection is premised on the following language of 11 U.S.C. § 1325(a)(5):

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> .    .    .    .    .
>
> (5) with respect to each allowed secured claim provided for by the plan—
>
> (A) the holder of such claim has accepted the plan;
>
> (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
>
> (C) the debtor surrenders the property securing such claim to such holder
>
> . . .

Debtors' Plan proposes to treat First American's claim as secured only to the extent of $1,000.00, the value of the 1978 Chevrolet pickup truck in which the Bank currently holds a security interest. Debtors propose in their Plan to avoid First American's lien against all of their farming equipment, implements, and horses under 11 U.S.C. § 522(f), and to treat and pay the balance of First American's debt as unsecured. In response, First American rejects the Plan and makes a twofold argument. First, the Bank argues that the Bankruptcy Code does not permit the avoidance of liens under § 522(f) in a Chapter 13 case. Because First American's lien against Debtors' farming equipment and implements would then survive, its claim must be treated under 11 U.S.C. § 506(a) as secured to the extent of the value of its present collateral including those items. Thus, the Bank argues, even conceding Debtors' valuations on First American's collateral, their Plan fails to provide that it retain its lien and then receive through the Plan property of a value as of the effective date of the Plan that is not less than the value of its collateral. Second, First American points out that in any event Debtors' Plan does not provide for payment of interest on its secured claim and merely proposes to pay a sum equal to the value of its collateral in periodic installments. First American thus argues that Debtors' Plan does not provide it with adequate protection of its interest, as required under 11 U.S.C. § 363, to compensate it for its loss of opportunity to seize its collateral, liquidate it, and reinvest the proceeds.

▮ The § 522(f) remedy may be applied to avoid nonpossessory, non-purchase money liens against large farming equipment and implements. *Middleton v. Farmers State Bank of Fosston*, 41 B.R. 953 (D.Minn.1984); *In re LaFond*, 45 B.R. 195 (Bankr.D.Minn.1984), *aff'd sub nom. Production Credit Association of St. Cloud v. LaFond*, 61 B.R. 303 (D.Minn.1985) (appeal to 8th Cir. pending).[10] Where the issue of

---

**10.** However, lien avoidance will probably not

lie against First American's security interest in

the availability of lien avoidance under § 522(f) in a Chapter 13 case has been litigated, the great majority of Courts have upheld it. *See, e.g., In re Hall,* 752 F.2d 582 (11th Cir.1985); *In re Velasquez,* 44 B.R. 1021 (Bankr.D.Idaho 1984); *Associates Financial Services Co. of Tennessee, Inc., v. Williams,* 39 B.R. 944 (Bankr.W.D. Va.1984); *Quidley v. Small Business Administration,* 39 B.R. 362 (Bankr.E.D.Va. 1984); *Blake v. Ledan,* 38 B.R. 604 (Bankr. E.D.N.Y.1984); *Schneider v. Fidelity National Bank,* 37 B.R. 747 (Bankr.N.D.Ga. 1984); *Fisk v. Allis Chalmers Credit Corp.,* 36 B.R. 924 (Bankr.W.D.Mich.1984); *Rasmus v. Associates Financial Services Company of Florida, Inc.,* 34 B.R. 9 (Bankr.M.D.Fla.1983); *In re Lincoln,* 30 B.R. 905 (Bankr.D.Colo.1983); *Slykerman v. Associates Financial Services,* 29 B.R. 82 (Bankr.E.D.Mich.1983); *Public Consumer Discount Company v. Leecan,* 27 B.R. 907 (Bankr.E.D.Pa.1983); *Associates Financial Services Company of Florida, Inc., v. Babineau,* 22 B.R. 936 (Bankr.M.D. Fla.1982); *In re Bowles,* 8 B.R. 394 (Bankr. S.D.Ohio 1981); *Household Finance Corporation v. Snow,* 8 B.R. 113 (Bankr.S.D. Ohio 1980); *Household Finance Corporation v. Brahm,* 7 B.R. 253 (Bankr.S.D.Ohio 1980); *Public Finance Corporation v. Lantz,* 7 B.R. 77 (Bankr.S.D.Ohio 1980); *In re Ohnstad,* 1 C.B.C.2d 494 (Bankr.S.D. 1980); *Jordan v. Borda,* 5 B.R. 59 (Bankr. D.N.J.1980); *In re Saberman,* 3 B.R. 316 (Bankr.N.D.Ill.1980). Those Courts so holding which have examined the question of whether § 1325(a)(5) prohibits the avoidance of liens in Chapter 13 cases under § 522(f) have held that it does not, reasoning that the "allowed secured claim" protected under § 1325(a)(5) extends only to the bankruptcy estate's interest in the property in question. Inasmuch as the process of exemption by a debtor removes property from the bankruptcy estate, the avoidance of liens against property which

would otherwise be exempt removes the exemptible value in the property from the encumbrance by the allowed secured claim which must survive confirmation of the plan under § 1325(a)(5). *See, e.g., In re Hall* at 588–9. The cases have also noted the express congressional goal of encouraging structured debt repayment through Chapter 13 by removing impediments to the proposal and confirmation of plans which existed under old Chapter XIII. S.REP. No. 595, 95th Cong., 2d Sess. 12–13 (1978). Those majority-line cases examining public policy have held that denying the availability of lien avoidance in a Chapter 13 case would frustrate this goal by giving debtors an incentive to file for Chapter 7 relief. There is no question § 522(f) lien avoidance lies in a Chapter 7 case. There is also no question that in this District dividends to unsecured creditors in the great majority of Chapter 7 cases by individuals are minimal or non-existent, due to the availability of both the § 522(d) "federal exemptions" and the very liberal exemptions under Minnesota state law. The Court concludes that denying lien avoidance in Chapter 13 would encourage more debtors to file Chapter 7 Petitions. This would in turn frustrate public policy in those cases by generating little or no cash dividend for *any* unsecured creditor in the case, and by placing the secured creditor whose lien is then subject to § 522(f) avoidance into the same status as non-recovering unsecured or partially-secured creditor by the unquestioned availability of the remedy in a Chapter 7 case. *See, in general,* McLaughlin, *Lien Avoidance by Debtors in Chapter 13 of the Bankruptcy Reform Act of 1978,* 58 AM.BANKR.L.J. 45, 64–67 (1984).

■ Thus, Debtors may use the remedy of lien avoidance under § 522(f) to avoid First American's nonpossessory, non-purchase money lien against their farming equipment and implements.[11] Debtors may

---

Debtor's horses. *In re Thompson,* 750 F.2d 628 (8th Cir.1984). Debtors will have to cope with this likelihood and its consequences for their treatment of First American's claim in their modified Plan, if they choose to propose one.

11. One question not specifically addressed by the parties is the procedure by which Debtors will avoid First American's lien. Debtors' Chapter 13 Plan does not specifically provide by its terms that First American's lien would be avoid-

then effectively reduce the amount of First American's allowed secured claim to the value of collateral against which lien avoidance will not lie. As a result, Debtors' Plan is not defective as to the *amount* of the allowed secured claim which must be protected under § 1325(a)(5) other than the possible addition of the values of the horses should this lien not be avoided and should Debtors elect to keep them.

▪ Even though First American's allowed secured claim must be reduced by the value of the equipment collateral subject to Debtors' lien avoidance power, First American has presented a valid objection to confirmation under § 1325(a)(5) to Debtors' proposed treatment of its remaining secured claim. Debtors' failure to discount the payments which they propose to make to satisfy First American's remaining secured debt violates the plain requirements of § 1325(a)(5)(B)(ii).

> Succinctly stated, in order for a plan to be confirmed, the secured creditor must be paid over the course of the plan the present value of the collateral securing the indebtedness. To accomplish this result, a present value factor (interest) should be applied to the deferred payments in order that the amount paid through the course of the plan equals the allowed amount of the claim as of the effective date of the plan ... the allowed amount of the secured claim corresponds directly to the value of the collateral securing the indebtedness.

*In re Williams*, 44 B.R. 422, 425 (Bankr.N. D.Miss.1984). At least one court has interpreted this provision language as mandating that a secured creditor receive compen-

sation for the delay in complete payment during the plan's duration. *In re Corliss*, 43 B.R. 176 (Bankr.D.Or.1984). First American has phrased this objection by arguing that Debtors have a duty to provide it with "adequate protection" of its interest during the duration of the Plan and that Debtors' failure to provide for accrual and payment of interest denies First American that adequate protection. Strictly speaking, the requirement of payment of "present value" under § 1325(a)(5) is not the same as the affording of "adequate protection" of a creditor's "lost opportunity value". However, as interpreted by the Courts the "payment of present value" requirement of § 1325(a)(5) leads to the same result—accrual and payment of interest on the secured component of a debt over the duration of a plan. *Compare In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984) and *In re Briggs Transportation Co.*, 3–84 CIV 224, slip op. (D.Minn., September 26, 1984), with *In re Trent*, 42 B.R. 279, 281 (Bankr.W.D.Va.1984) and *In re Corliss* at 179. Debtors' failure to provide for a discounting of their payments (or, stated another way, Debtors' failure to provide for accrual and payment of interest on the secured portion of their debt to First American) prevents the Court from finding that the Plan comports with § 1325(a)(5).[12] Because Debtors' Plan fails to comply with this requirement, it may not be confirmed. *Gen. Motors Accept. Corp. v. Lefevre*, 38 B.R. 980 (D.Vt.1983).

### 4. § 1325(a)(6): Feasibility.

▪ First American's fourth objection is premised upon the following language of 11 U.S.C. § 1325(a)(6):

---

ed by operation of the confirmation of Debtors' Plan. 11 U.S.C. § 1322 does not specifically grant the debtor the right to provide for lien avoidance in the plan itself. The preferable procedure, one which would allow full opportunity to litigate all of the issues specific to § 522(f), is to avoid the lien by motion pursuant to BANKR.R. 4003(d). *In re McKay*, 732 F.2d 44 (3rd Cir.1984).

12. The present dispute does not require the Court to determine an appropriate discount rate. The Courts have applied several different standards, including the contract rate (*In re*

*Frey*, 34 B.R. 607 (Bankr.M.D.Pa.1983)), "prevailing market rates" (*In re Thorne*, 34 B.R. 428 (Bankr.E.D.Tenn.1983)), the current coupon yield rate of 52–week treasury bills auctioned every four weeks (*In re Corliss; In re Mitchell*, 39 B.R. 696 (Bankr.D.Or.1984)), or a judicially-set rate using an amalgam of two or more of these factors (*In re Trent* ). Though the Court need not determine the standard at present, it notes that the *Mitchell* Court's discussion of the factors in favor of the treasury bill rate is both cogent and comprehensive.

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . . .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

The factual basis for this objection revolves around Debtors' announced intention to continue breeding and raising horses. First American argues that this activity has never generated net income for Debtors and, in fact, is a net drain on their resources and their bankruptcy estate. Debtors have failed to budget any expenses for horse breeding and raising in their Chapter 13 Plan. First American points out that Debtors expended at least $1,907.00 during tax year 1984 for out-of-pocket expenses for their horses, not including depreciation and feed, and costs (such as utilities) which they have already scheduled in their Chapter 13 Plan. First American further notes that continuation of breeding will produce unbudgeted expense of at least $300.00 each time a mare settles. Lastly, it notes that though Debtors profess their goal of reducing their out-of-pocket feed expenses to almost nothing, they have failed to budget in the expense of growing and/or custom-combining additional feed. First American argues that budgeting in all of these expenses (which will exceed $2,000.00 per year) would exhaust all funds from which Debtors propose to make their Chapter 13 payments.

First American's argument that Debtors' horse raising is nothing more than an expensive hobby is facially compelling. The activity has indeed failed to generate any net income; it has been a drain on Debtors' finances. On the "positive" side, Marjorie has also claimed substantial income tax deductions on its account, rightly or wrongly, which have led to the scheduled tax refunds. Debtors have acknowledged that horse raising has been marginal as a business activity for them; however, they have

also shown a good-faith willingness to reduce their out-of-pocket expenditures for it to a minimal amount. Whether this willingness is realistically founded will be proven by experience. Debtors may well have to choose between sacrificing horse raising and maintaining their Chapter 13 payments on the one hand, and continuing horse raising and converting or dismissing their Chapter 13 case on the other.[13] Though the question is close, on the record as made the Court cannot conclude that Debtors' horse-raising activity will prevent them from carrying out their payment duties under their Chapter 13 Plan. Thus, so far as First American's specific objection is concerned, the Court concludes the Plan is feasible.

### 5. § 523(a)(2)(B): Alleged Nondischargeability of Debtors' Debt to First American.

As its fifth major objection, First American argues that Debtors' debt to it was incurred on the basis of false financial statements, and hence is nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(2)(B). There is no statutory provision barring confirmation of Debtors' Plan on this basis standing alone, even were First American to prove up all of the elements of a nondischargeable debt under § 523(a)(2)(B). To the contrary, 11 U.S.C. § 1328(a) provides in pertinent part as follows:

(a) As soon as practicable after completion by the debtor of all payments under the plan, ... the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

(1) provided for under section 1322(b)(5) of this title; or

(2) of the kind specified in section 523(a)(5) of this title.

Thus, all debts which may be found nondischargeable in a Chapter 7 cause under

---

**13.** Given the consequences attendant to the latter, the Court suspects Debtors would elect the former if they had to choose.

§ 523(a) may be discharged in a Chapter 13 case, other than the family support obligations made nondischargeable by § 523(a)(5). Congress fully intended this result. H.R.REP. No. 595, 95th Cong., 1st Sess. 430 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6385. *See also, In re Tackaberry,* 13 B.R. 881 (Bankr.D.Minn. 1981); *In re Spada,* 32 B.R. 105 (Bankr.E. D.Calif.1983). However, First American apparently argues that the alleged nondischargeability of its debt bears on the "good faith" requirement of 11 U.S.C. § 1325(a)(3), as one of the several factors which this Court must consider under *In re Estus,* 695 F.2d 311 (8th Cir.1982). For this reason, this ground is more appropriately discussed in the following section of this memorandum.

### 6. § 1325(a)(3): Good Faith.

First American's final objection arises under the following provision of 11 U.S.C. § 1325(a)(3):

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> .    .    .    .    .    .
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law ...

In support of this objection, First American points out that Debtors' Plan provides for a dividend to unsecured creditors of nine percent, as calculated by Debtors, and of eight percent or less, as calculated by First American. First American cites the cases holding that such a "nominal payment" is one of the factors which, in conjunction with other circumstances, may prevent a finding that a Chapter 13 Plan was proposed in good faith. *See, e.g., In re Estus; In re Kitchens,* 702 F.2d 885 (11th Cir. 1983).

First American also alleges that Debtors' bad faith in proposing their Plan is further demonstrated by the factors that Debtors' surplus income is greater than that set forth in their Chapter 13 pleadings; that the Plan fails to account for the possibility of increases in Marjorie's income and to provide for periodic review and increase of Plan payments; that Debtors' pleadings are rife with material misstatements and omissions of information unfavorable to the confirmability of the Plan, and that the Plan unfairly discriminates against and unlawfully modifies First American's secured claim. It argues generally that Debtors were motivated to file a Chapter 13 case only after a prior abortive attempt to file a Chapter 7 Petition and after First American's loan officer threatened to commence dischargeability litigation against Debtors if they filed a Chapter 7 Petition.

In *Estus,* the Eighth Circuit declined to hold that a "substantial" payment to unsecured creditors was required in every Chapter 13 case under the good faith standard of § 1325(a)(3). However, the Court did include "the amount of the proposed payments and the amount of the debtors' surplus" as one of the several factors to be considered in determining good faith and held

> [c]ertainly an important factor the courts must weigh in their analysis is the percentage of payment to unsecured creditors which the plan proposes. A low percentage proposal should cause the courts to look askance at the plan since repayment is one purpose of a Chapter 13 plan.

695 F.2d at 317. *Cf. In re Terry,* 630 F.2d 634 (8th Cir.1980) (Bankruptcy Court may not find plan proposing *no* dividend to unsecured creditors to have been filed in good faith). Rather, the Court held that the primary inquiry should be "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Estus* at 316. The Court mandated a case-by-case determination upon of the circumstances, highlighting the following non-exclusive factors:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
>
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
>
> (3) the probable expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.

*Estus* at 317.

■■■■ Debtors have proposed monthly payments of $200.00, an amount equivalent to approximately 9% of their net monthly income. As noted earlier, the Court rejects First American's insinuations that Debtors will have a substantial surplus remaining after payment of their necessary monthly living expenses and their Chapter 13 obligation. A post-Chapter 13 surplus of some limited magnitude is not a badge of bad faith. The uncertainties of rural life over the duration of their Plan will certainly require Debtors to incur unexpected additional expenses; their budget must contain some leeway to allow them to meet these expenses. The fact that Debtors may have recognized this when they formulated their Plan is no mark of bad faith. *In re Raines,* 33 B.R. 379 (M.D.Tenn.1983). Sec-

ond, Debtors have demonstrated Marjorie's ability to contribute substantial amounts to Debtors' family income and, to the extent possible given the current vagaries of the agricultural economy, that Dwayne will also continue to derive net income from farming. The evidence of possible substantial increases in Marjorie's wages was inconclusive at best; in any event, if such increases are forthcoming it may be open to Debtors' Trustee to move to modify Debtors' Plan under LOC.R.BANKR.P. (D.Minn.) 136(a). On the record as made, Debtors have demonstrated their ability to fund their Plan over its 36–month duration.[14] The Court concludes that none of the contents of the Plan prevents a finding of good faith under the fourth through sixth *Estus* factors. It does not appear that Debtors have attempted to intentionally mislead the Court in their recitations of property values, debts, expenses, and the contemplated dividend to unsecured creditors under their Plan; the discrepancy in the percentage of dividend argued by First American is relatively minor. The fact that a debtor valued estate property differently in pre-bankruptcy activity is not in itself evidence of bad faith. *In re Norman* at 570. First American's objection that the Plan unfairly discriminates against it, as compared to the treatment of other unsecured creditors, cannot be sustained. Debtors' modification of First American's claim, while admittedly draconian, is nonetheless made in accordance with 11 U.S.C. §§ 522(f) and 506. The mere fact that other holders of secured claims do not have avoidable liens, or are still fully secured by collateral in Debtors' possession, is the result of no perfidious action by Debtors. Debtors lack the ability to modify the other secured claims and have not done so. Debtors' treatment of First American's

**14.** The Court is aware that the new Local Rules of Bankruptcy Procedure for this District favor five-year Chapter 13 Plans, in accordance with long-established practice in the divisions of this Court headquartered in the Minneapolis-St. Paul metropolitan area. The recent substitution of the standing Chapter 13 Trustee at Minneapolis onto all cases pending in the Fifth Division will tend to make this practice District-wide. In

recognition of Debtors' probable reliance on prior practice in this Division, the Court will not deny confirmation on the 36–month duration of Debtors' Plan—though this action is without prejudice to the Trustee's right to seek post-confirmation modification under LOC.R.BANKR.P. (D.Minn.) 136(a) at the appropriate time, if a modified Plan is eventually confirmed in this case.

claim is based on the Bankruptcy Code and its degree is rationally related to the statutory basis for it. Debtors could not carry out their Plan without it. As a result, Debtors' discrimination against First American is not made in bad faith. *See, e.g., In re Wolff*, 22 B.R. 510, 512 (Bankr. 9th Cir.1982). This Court cannot find bad faith in Debtors' choice to make the broadest possible use of available remedies. *In re Lincoln*, 30 B.R. 905, 909 (Bankr.D.Colo. 1983).

■ The bulk of trial time on First American's good faith objection was taken up with the issue of the dischargeability of Debtors' debt to First American case under 11 U.S.C. § 523(a)(2)(B). While testimony on this issue consumed several hours, the depth of evidence did not approach that customarily received at trial in a adversary proceeding. As such, First American's proof hardly approached the quantum of clear and convincing evidence ordinarily required under § 523(a)(2)(B). *See, e.g., In re Harms*, 53 B.R. 134 (Bankr.D.Minn.1985). The gist of First American's argument that Debtors' debt would be nondischargeable is that Debtors falsely stated on several financial statements that Dwayne owned cattle and other livestock which actually belonged to Paul. The Court does not attach utter credibility to Dwayne's testimony that he believed that the financial statement was required only for the purpose of describing the cows which he was milking and using rather than cows which he owned. On the other hand, Mr. Grove's testimony on his understanding of Dwayne's and Paul's agreement suggests he was aware that Paul owned at least a substantial portion of the herd they were using, as he knew Dwayne was entitled to receive the offspring of Paul's livestock. Thus, the reasonableness of First American's reliance on the financial statements is questionable. *In re Harms* at 143–44. Basically, the totality of the evidence presented does not compel the conclusion that Debtors were engaging in a comprehensive scheme to fraudulently obtain credit from First American based upon misstatements

of assets. Because the record is less than replete, the Court cannot conclude at this point that Debtors' debt to First American would be nondischargeable in a Chapter 7 case under § 523(a)(2)(B). However, even if the Court were to so conclude, nondischargeability of debt is only one of the several factors to be considered under the *Estus* standard. *In re McMonagle*, 30 B.R. 899, 904 (Bankr.S.D.1983). "However distasteful the debt sought to be discharged may be, the nondischargeability of an intentionally fraudulently procured obligation under § 523(a) of the Code does not, *per se*, preclude confirmation [of a Chapter 13 plan]." *In re Kern*, 40 B.R. 26, 28 (Bankr.S.D.N.Y.1984). *See also In re Slade*, 15 B.R. 910 (Bankr. 9th Cir.1981); *In re McAloon*, 44 B.R. 831 (Bankr.E.D.Va. 1984). Where all of the other circumstances surrounding proposal of the plan do not establish bad faith, a debtor has the right to utilize the enhanced discharge under Chapter 13 to his best advantage. *In re Vensel*, 39 B.R. 866, 869 (Bankr.E.D.Va. 1984); *In re Tramonto*, 23 B.R. 464 (Bankr.W.D.N.Y.1982).

Though this is Debtors' second bankruptcy case, it does not appear from the nature of the debt scheduled in either Petition that Debtors improvidently incurred debt, or became obligated for goods and services which were beyond their ability to pay for. Debtors' first bankruptcy Petitions were filed eight years prior to this Petition, and were apparently the result of large medical obligations. Debtors' attempt at debt composition through Credit Advisors evidences their pre-bankruptcy attempt to satisfy their creditors in an orderly fashion. The timing of the filing of Debtors' Chapter 13 and abortive Chapter 7 Petitions in 1984 indicates that they sought bankruptcy relief only when forced to, and, apparently, only in response to First American's attempted enforcement of its security interest. While Debtors filed under Chapter 13 only after First American's threat of dischargeability litigation, they apparently did so as a tactical measure, only after a

weighing of the respective cost of proceedings under both Chapters.[15]

Lastly, this case does not appear on its face to impose any administrative burden on the Trustee greater than that in the usual Chapter 13 case in this District. While all of the factors discussed demonstrate that Debtors have lacked foresight, awareness and sophistication, they do not suggest that Debtors acted with any particular malice toward First American or with any intent to abuse the provisions, purpose or spirit of Chapter 13. Thus, it cannot be said that Debtors have not proposed their Plan in good faith and by means not forbidden by law.

### 7. CONCLUSION

The Court has overruled all of First American's objections to confirmation but that under § 1325(a)(5). That objection is sustained, both because of Debtors' failure to use a discount factor in their treatment of First American's secured claim and because of the as-yet unresolved issues surrounding avoidance of First American's liens under § 522(f). After denial of confirmation of a Chapter 13 Plan, an allowance of time to file a modified Plan responding to sustained objections is usually appropriate. *In re Higgins*, 43 B.R. 391, 393 (Bankr.N.D.Ala.1984). The Order entered this date has granted Debtors a reasonable time to respond to the concerns set forth in this Memorandum.

---

15. Debtors' tactical choice probably did not result in lower attorney fees for them; the confirmation proceedings became easily as involved and complex as the average dischargeability adversary proceeding in a Chapter 7 case.