**In re Walter A. BIGALK, Debtor.**
**Bankruptcy No. 3–87–067.**
United States Bankruptcy Court,
D. Minnesota,
Third Division.
June 29, 1987.

Wendy Alison Nora, Minneapolis, Minn., for debtor.

David A. Joerg, Preston, Minn., for Lanesboro State Bank.

Michael J. Iannacone, St. Paul, Minn., Chapter 12 trustee.

### MEMORANDUM TO ORDER OF MAY 22, 1987 RE: MOTION OF LANESBORO STATE BANK

GREGORY F. KISHEL, Bankruptcy Judge.

On May 22, 1987, this Court entered an order on the motion of Lanesboro State Bank, a secured creditor (hereinafter "the Bank") for relief under 11 U.S.C. § 1201, and on Debtor's responsive motion. This memorandum is entered to set forth Findings of Fact and Conclusions of Law upon which the Court premised that order.

Debtor filed a voluntary petition under Chapter 12 of the Bankruptcy Code in this Court on January 9, 1987. He is a Fillmore County, Minnesota farmer. The Bank is one of his major secured creditors.

On January 29, 1981, Debtor married the former Betty Pederson (hereinafter "Betty"), who is his wife at present. Betty's deceased husband, Arlen Pederson, had been a Houston County, Minnesota farmer who had owned a 450-acre farm in joint tenancy with Betty and had accumulated a substantial amount of farm machinery and equipment. The Bank was a major secured creditor of Mr. Pederson and held security interests in all of his farm machinery and equipment. Mr. Pederson died in 1980. Betty filed an affidavit of survivorship to clear title to the farm but has never commenced proceedings to probate the Pederson estate. After Mr. Pederson's death, an employee of the Bank requested Betty to assume personal liability for the debts secured by the farm machinery and equipment now in her possession, as a condition of her retained possession and use of the equipment. Betty signed a note and an accompanying security agreement as requested and has signed renewal and extension notes on this loan, and notes for additional advances from the Bank, on a number of occasions since then.

After Debtor and Betty got married, they physically consolidated the farming operations in which they had engaged on their separate farms. They have never executed deeds, bills of sale, or other documents to evidence any transfer of ownership of their premarital real or personal property into any form of joint ownership. They have engaged in a combination of dairy and beef cattle farming and raising of cash crops, principally corn. They have worked each other's land and managed livestock herds which one or the other of them brought into the marriage. Both of them have contributed their labor to the management of the consolidated operation since the marriage. Since Arlen Pederson's death, Betty has jointly owned and managed a beef cattle herd with Wayne Howard, her son by another prior marriage.

In early 1987, Debtor, Betty, and Wayne Howard had an appraisal of all of their various farming equipment and livestock done, which resulted in the preparation of a written descriptive list of all of the items.[1] Debtor testified from this list under oath at the Meeting of Creditors in this case, as to the ownership of the equipment and livestock on his and Betty's farms. Debtor identified those items which were his sole,

---

1. This list, marked as "Deposition Exhibit 11," was received into evidence at hearing. A vari-

ant, marked as "Deposition Exhibit 16," was also received.

premarital property by marking them with a line *after* the item; he identified those items which were Wayne Howard's separate, individual property with a "W" or a line *before* the item, in the left-hand margin. This list is an accurate representation of the number and variety of items which Debtor, Betty, and Wayne Howard owned as of the commencement of this case, as well as of the claims of each of them to sole ownership of the individual items as of that date.

Debtor's and Betty's financial dealings with the Bank are somewhat convoluted at first first glance, but after review take on a semblance of order. Betty remained solely liable on the debt of approximately $51,000.00 which she assumed from the Arlen Pederson estate; the Bank continued to renew that obligation and to extend additional credit to Betty individually until January 18, 1985. On that date, Debtor first signed a note making himself jointly liable on Betty's pre-existing, premarital debt. The January 18, 1985 note was in an outstanding principal balance of $156,030.97, and was secured by a real estate mortgage on a portion of Betty's farm granted on the same date and a security interest in personal property granted by Betty almost one year previously. On March 7, 1985, Debtor and Betty executed a joint security agreement terming both of them as debtors, under which they granted the Bank a security interest in all of their inventory, equipment, farm products, and various rights to payment.

Over the period from December, 1980 through January, 1985, Betty gave several financial statements to the Bank in connection with renewals of prior credit and extensions of new credit. A summary of these financial statements and their asserted values for Betty's equipment is as follows:

| DATE | VALUE OF EQUIPMENT |
| --- | --- |
| December 8, 1980 | $ 65,000 |
| December 16, 1981 | $ 65,000 |
| January 27, 1983 | $ 68,800 |
| January 24, 1984 | $129,177.50 |
| January 17, 1985 | $129,177.50 |

None of these financial statements enumerated the specific items contained in the general category of farming equipment. On none of them did Betty make any statement denying or qualifying the implied assertion that she held a full ownership interest in all of the property scheduled. Betty individually received all of the consideration for renewals and new extensions of credit by the Bank up through and including the January 18, 1985 note. All of the new advances of credit granted by the Bank to Betty were intended by both the Bank's officers and Betty for the maintenance of her farming opration via payment of crop and crop input expenses, purchase of additional equipment, payment of farm real estate taxes, the making of current payments on other farm-related debt, or for other purposes directly related to farming. Betty in fact used all proceeds from loans from the Bank for agricultural purposes with one exception, an automobile loan made to her shortly after Arlen Pederson's death, in a principal balance of $3,310.00.

Walter had no lender-borrower relationship with the Bank before March 7, 1985, when he took out a loan to pay off his outstanding debt to a local Production Credit Association. Betty also signed this note. Over the course of the next three months, Walter and Betty jointly executed another note in this line of credit and Walter individually executed three additional notes in this line of credit. In connection with the initial extension of credit on March 7, 1985, Walter gave the Bank a financial statement in which he scheduled a value for machinery and equipment of $17,-350.00.

As of March 9, 1987, Debtor and Betty collectively owed the Bank a total of $221,-129.35, in principal and accrued interest, of which $170,134.32 was attributable to Betty's line of credit (on which Debtor is jointly liable) and of which $50,495.03 was attributable to Debtor's line of credit evidenced by the five notes. In late 1985, Debtor terminated a milk assignment which had provided for monthly payments to the Bank from the proceeds of milk produced by him and Betty. Neither Debt-

or nor Betty have made any payments on any of this debt since mid-March, 1986.

Neither Debtor and Betty, nor Betty and Wayne Howard, have ever executed a formal partnership agreement establishing the legal terms and conditions of their joint farming activity. On March 7, 1985, Debtor and Betty executed a "Partnership Authorization Certificate" on a pre-printed form supplied by the Bank. This document purports to be instructions to the Bank on behalf of a partnership named "Walter Bigalk or Betty Bigalk" to honor acts of one of those individuals or the other as binding in the banking and debtor-creditor relationship on the two of them and their "partnership." Neither Debtor nor Betty ever executed a deed, bill of sale, or other instrument transferring ownership of their separate premarital property into a partnership involving either or both of them and/or Wayne Howard. There is no evidence that they ever held themselves out to the Bank, any other creditor, or any other person or entity, as members of a partnership. On March 2, 1987, Debtor, Betty, and Wayne Howard filed a federal partnership income tax return for tax year 1986, alleging that the three of them were in partnership and that they had "commenced such business" in 1986. Since April 1, 1987, the Internal Revenue Service has issued the three of them a single federal employer's identification number for tax purposes. There is no allegation in Debtor's Statement of Financial Affairs in this bankruptcy case that he was involved in a partnership prior to or as of the commencement of the case.

In 1981, Debtor gave Betty some of the smaller steers from his beef cattle herd. In 1982, Debtor loaned Wayne and Betty three milk cows from his herd for use in their milking operation; these cows subsequently had several heifers. The three parties have always treated these livestock as continuing to be Debtor's property. Betty may have inadvertently listed some of these livestock in financial statements which she gave to the Bank after the loan.

On March 25, 1986, Betty filed a Chapter 13 petition in this Court. At all times during the pendency of that case she appeared in Court *pro se.* During the pendency of the Bank's motion for relief from stay, Betty requested that that case be dismissed. This Court dismissed Betty's case by Order dated December 9, 1986.

In late December, 1986, or early January, 1987, the Bank commenced a replevin action in Minnesota State District Court for the Third Judicial District, Fillmore County, under the caption of *Lanesboro State Bank v. Walter Bigalk and Betty Bigalk.* On January 27, 1987, counsel for the Bank made a motion for entry of default judgment in that action, solely as against Betty and Betty's separate property subject to the Bank's security interests. Counsel for Debtor and the Bank dispute whether counsel for the Bank gave counsel for Debtor full notice of his intention to proceed on that basis. Counsel for Debtor admits that she did not appear at the hearing in reliance on her conclusions as to the applicability of the "codebtor stay" under 11 U.S.C. § 1201 and the pendency of this case. On January 27, 1987, the state District Court entered a default judgment against Betty in the Bank's favor, authorizing the repossession and disposition under the Uniform Commercial Code of enumerated items of farm equipment which that Court found to be Betty's sole and separate property. The Bank has refrained from enforcing this Order via sheriff execution pending this Court's decision on the present motions.

■ The Bank seeks a determination of its right to proceed against Betty under 11 U.S.C. § 1201, which is titled "Stay of action against codebtor," and which provides in pertinent part as follows:

(a) Except as provided in subsections (b) and (c) of this section, after the order for relief under this chapter, a creditor may not act, or commence or continue any civil action, to collect all or any part of a consumer debt of the debtor from any individual that is liable on such debt with the debtor, or that secured such debt, unless—

(1) such individual became liable on or secured such debt in the ordinary course of such individual's business; or

(2) the case is closed, dismissed, or converted to a case under chapter 7 of this title.[2]

Section 1201 is a verbatim reenactment of 11 U.S.C. § 1301 in the Chapter 12 context. As a result, the legislative history of, and caselaw development under, § 1301 are appropriately consulted in applying § 1201. Section 1301 was "designed to protect a debtor operating under a chapter 13 individual repayment plan case by insulating him from indirect pressures from his creditors exerted through friends or relatives that may have co-signed an obligation of the debtor." H.R.REP. No. 595, 95th Cong., 1st Sess. 426 (1977); S.REP. No. 989, 95th Cong.2d Sess. 138 (1978), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6381; *In re Francis*, 15 B.R. 998, 1000 (Bankr.E.D.N.Y.1981). By their terms, §§ 1201 and 1301 proscribe only the collection *of a consumer debt* from a co-signer. "Consumer debt" is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(7). Though 11 U.S.C. § 101 contains no definition of the term "codebtor," the legislative history indicates that the codebtor is to be considered as the signing obligor who did not receive the consideration for the claim held by the creditor, and, therefore, who put forward his creditworthiness and assumed liability on the debt solely for the benefit of the debtor now in bankruptcy. H.R.REP. No. 595, 95th Cong., 1st Sess. 426 (1977); S.REP. No. 989, 95th Cong.2d Sess. 138 (1978).

Debtor has vigorously defended the Bank's motion, though neither the presentation of evidence at trial nor the arguments of law completely and clearly articulate the factual and legal bases for his resistance. However, it appears from a thorough review of the nature of the evidence presented as well as the oral and written arguments that Debtor raises two defenses in the disjunctive to the Bank's motion. First, Debtor argues that the Bank was stayed by the co-debtor stay of 11 U.S.C. § 1201 from enforcing any of the combined debt obligation against Betty or Betty's property. Apparently in the alternative, Debtor argues that Debtor and Betty were engaged in a farming partnership after the date of their marriage, that Debtor then gained an ownership interest in Betty's farming equipment and livestock as a result of their engagement in that partnership, as a result of his assumption of liability on Betty's debt, or as a result of the marriage relationship, and that, therefore, the automatic stay of 11 U.S.C. § 362(a) restrained and restrains the Bank from taking any action to enforce its security interests that would affect Debtor's undivided fractional interest in all of the equipment and livestock.[3] Debtor also has affirmatively moved for an order of this Court "vacating" the State District Court replevin order on the ground that it violated one or the other of the stay provisions asserted by him.

## I. APPLICABILITY OF "CODEBTOR STAY" OF 11 U.S.C. § 1201.

■ Debtor argues that Betty's interests in the Bank's collateral were and are protected by the "codebtor stay" of 11 U.S.C. § 1201 from any action by the Bank to realize on its security interest. Debtor's reliance on the codebtor stay fails in two crucial regards. First, Betty does not qualify as a "codebtor" within the meaning of § 1201. Congress clearly intended the statute to afford relief to a debtor by depriving a creditor of the considerable extrajudicial pressure which could be brought to bear toward surrender of collateral, reaffirmation, or other realization on debt, by continuing concerted collection action against an "innocent" third-party co-obligor

---

**2.** 11 U.S.C. § 1201(c) sets forth grounds for a grant of relief from the codebtor stay. Those provisions are irrelevant here, as the Court has concluded that the codebtor stay does not apply in the first instance as urged by Debtor.

**3.** This seems to be the argument; Debtor's counsel did not cite § 362(a) in argument, though

she made much of the alleged existence of the partnership, the property interests allegedly arising from it, and the need for protection of those property interests in bankruptcy. In her several briefs she made passing references to § 362(a).

not in bankruptcy. The legislative history cited *supra* at pp. 564–65 makes it clear that Congress did not intend to allow the codebtor stay to be asserted by a co-obligor who in fact received the consideration for the debt. *In re Cooper*, 3 B.R. 246, 248 (Bankr.S.D.Calif.1980). *In re Johnson*, 1 C.B.C.2d 547, 548 (Bankr.W.D.N.Y.1980). Obviously, Congress sought to stay collection only as against co-obligors who extended their credit as a family or personal accommodation to the obligor who actually received the benefit of the extension of credit. Here, it is clear that, as to the component of the combined debt which the Bank seeks to enforce, Betty—rather than Debtor—received all of the consideration.[4] Thus, Debtor may not invoke the codebtor stay on Betty's behalf, as she was not a codebtor within the meaning of the statute.

■ Second, and more clearly, the codebtor stay is not available to Betty because her debt to the Bank is not characterized as a "consumer debt." An extension of credit for the commencement or continuation of large-scale agricultural or business activity simply is not made for "a personal, family, or household purpose."[5] With the minor exception of the 1981 advance of approximately $3,000.00 for an automobile purchase, all of the Bank's extensions and renewals of credit to Betty from 1981 to 1985 were for business purposes—whether they were for the renewal of Arlen Pederson's prior agricultural loans, or for crop inputs, repairs, real estate taxes, or any of the other reasons noted in the Bank's narrative history of Betty's line of credit. *In re Demaree*, 27 B.R. 1, 2 (Bank.D.Ore. 1982). Where the debtor's entry into a credit transaction is motivated by a desire for business profit, the debt created thereby cannot be classified as a "consumer debt." *In re Almendinger*, 56 B.R. 97, 99 (Bankr.N.D. Ohio 1985). See also *In re Nenninger*, 32 B.R. 624 (Bankr.W.D.Wis. 1983). The codebtor stay of § 1201 simply does not restrain the enforcement of nonconsumer debt against a co-obligor, even if that person is properly classified as a codebtor. *In re Demaree*, 27 B.R. at 2; *In re Chrisman*, 27 B.R. 648 (Bankr.S.D. Ohio 1982). Thus, even were Betty able to invoke § 1201 by virtue of her status under the debt, the characterization of virtually all of her debt to the Bank as agricultural or business debt prevents Debtor's and her invocation of § 1201.[6]

**4.** Debtor's counsel's argument that Betty received no consideration for her assumption of personal liability for Arlen Pederson's obligation is almost ludicrous. Had she not assumed personal liability after Mr. Pederson's death, and had the debt remained unpaid, the Bank would have been completely free to enforce its security interests in the equipment and its mortgage against the Pederson farm. The Bank accommodated her by forbearing from enforcing its rights at that time, in return for her agreement to assume and service the debt. Had she not done so she would almost certainly have lost all or a good portion of it to the Bank.

**5.** In a different context that involves an analogous legal question, the Eighth Circuit has held that a farmer cannot be said to hold 200 little pigs for "personal, family, or household use" within the meaning of 11 U.S.C. § 522(f)(2)(A). *In re Thompson*, 750 F.2d 628 (8th Cir.1984). In *Thompson*, the Eighth Circuit recognized that the farmer-debtor's hog-raising activity was "*a capital business venture,* financed as such." 750 F.2d at 630 (emphasis added).

**6.** The Court reaches this conclusion on the plain language of the statute, in accordance with its expressed reluctance to judicially legislate by making particular bankruptcy remedies available to petitioners who are not eligible under congressional enactment to invoke them. *See In re Groth*, 69 Bankr. 90, 15 B.C.D. 565 (Bankr. D.Minn.1987). The substantive inquiry thus ends here, though one point deserves mention. The conclusion compelled here is only one reason why the perfunctory incorporation of several of the substantive provisions of Chapter 13 into Chapter 12 was probably not well-directed. Congress enacted Chapter 12 to address the perceived deficiencies of reorganization under Chapters 11 and 13 in the context of family farming operations, recognizing that the size and complexity of many family farmers' debt structures made Chapter 13 relief unavailable on eligibility or procedural grounds. Joint Explanatory Statement of the Committee of Conference, 132 CONG.REC. H8998–9 (daily ed. October 2, 1986). By and large, the debt structures of financially-distressed farmers—at least in this District—have included no more than very small components of consumer debt. Had Congress really wished to minimize the impediment to reorganization posed by creditors' extrajudicial pressure on "innocent" co-obligors in family farmer reorganization cases, it should have extended the scope of the codebtor stay to agricultural loans. This is a legislative judgment,

## II. APPLICABILITY OF AUTOMATIC STAY OF 11 U.S.C. § 362(a).

Debtor alternatively argues that, as a result of his legal relationship with Betty, he has succeeded to an ownership interest in Betty's property subject to the Bank's security interest that itself was and is protected by the automatic stay of 11 U.S.C. § 362(a). Debtor's assertion of a property right protected in bankruptcy is mainly premised on his argument that he and Betty (and, additionally, Wayne Howard) have been involved in a farming partnership, the creation of which altered their pre-existing separate property rights.[7]

### A. Existence of Partnership, and Ownership Rights Arising Therefrom.

Debtor points to his six-year ongoing joint farming operation with Betty and Wayne Howard; his assumption of personal liability on Betty's debts to the Bank in 1985; and his, Betty's, and Wayne Howard's sharing of profits derived from their farming activity; and the fact that they have recently held themselves out as a partnership to the Internal Revenue Service, as evidence compelling a finding that they were in partnership at all times material to these motions. In Minnesota, the existence of a partnership is an issue of fact which must be decided upon all the circumstances. MINN.STAT. § 323.06; *Cyrus v. Cyrus,* 242 Minn. 180, 183, 64

N.W.2d 538, 541 (1954); *In re Schyma,* 68 B.R. 52, 60 (Bankr.D.Minn.1985). Generally speaking, the Court may find that parties to a business are in partnership where "the evidence as a whole reasonably shows that the parties have entered into a contractual relation whereby they have combined their property, labor, and skill in an enterprise or business as co-owners for the purpose of joint profit." *Cyrus,* 242 Minn. at 184, 64 N.W.2d at 541; *Schyma,* 68 B.R. at 60.

■ In the case at bar, the Court has no difficulty with finding that Debtor and Betty have been engaged in a farming partnership since the date of their marriage.[8] Clearly, Debtor and Betty agreed—explicitly or otherwise—that they would labor together, using property which they brought into the marriage, and (apparently) accumulating additional property as they were able or as necessary, with the goal of generating income for their mutual well-being. However, as noted by this Court in *Schyma,* the mere existence of the partnership does not compel the conclusion that the parties agreed to, or actually did, transfer any of their pre-partnership, premarital individual property into joint ownership or into the ownership of any separate partnership entity. 68 B.R. at 61–62. The mere existence of Debtor's and Betty's marriage contract—even given their cohabitation, joint use of each other's personal property, and status as mutual agents for business purposes—did not have the consequence of

---

however, which the constitutional division of powers prohibits this Court from making and applying.

**7.** Debtor also argues—repeatedly, though without citation to legal authority—that he gained an ownership interest in Betty's premarital property by assuming personal liability on her debt, and that because the Bank accepted payment from him on the now-joint debt it is estopped from arguing that he has no ownership interest in Betty's property. The argument is completely unfounded. Only Betty—as owner—had the right to create new ownership interests in her property. In the absence of a concomitant act by her to create joint ownership in the encumbered property, Debtor's assumption of personal liability on her debt did not and could not affect the prior ownership interests in that property. The only legal consequence of Debtor's action was to give the Bank another

source of recourse on Betty's debt. If anyone is estopped on the ownership issue on the basis of the record before the Court, it is Debtor. Not once in the annual financial statements given separately by Betty and Debtor to the Bank from 1981 to 1985 did either of them allege that the other spouse held any joint ownership interest in the property scheduled thereon. The Bank reasonably relied on these representations in extending and renewing credit and in drafting documents to create and perfect its security interests.

**8.** The issues presented do not require the Court to determine whether Wayne Howard was a part of this partnership. The evidence does not establish with utter clarity that the three have all engaged in the same farming activities, or that all of them have placed all of their individual revenues into one pot from which they have shared profits.

vesting ownership rights to Betty's premarital property in Debtor. *Hossfeldt v. Dill*, 28 Minn. 469, 471, 10 N.W. 781 (1881); *Heartz v. Klinkhammer*, 39 Minn. 486, 488, 40 N.W. 826 (1888).[9] In order for this Court to conclude that Debtor and Betty had in fact intended to transfer all property to joint ownership, or to a partnership consisting of the two of them, it was incumbent on Debtor to produce clear evidence—ideally in the form of written instruments—of such an intent and the action taken on the basis of it. The evidence of the intent of the parties as to ownership was vague, confusing, and equivocal at best; it totally lacked specificity as to the times at which the parties may have made decisions about their purported partnership, the identity of property to be affected by the relationship, the property rights which each of them would have in the event of various contingencies, and other factors which would support a finding of an intent to actually alter their pre-existing individual property rights. If anything, Debtor's single statement that he had assumed liability on Betty's debt to the Bank because "everything [the farming-equipment collateral] was together anyway," and because it was "all one muddle more or less," is negated by the testimony clearly establishing that Debtor, Betty, and Wayne Howard all continued to treat premarital livestock as the continuing separate property of the persons who brought it into the marriage and the partnership. On the record before it, the Court simply cannot conclude that any of the three ever had any intention to transfer ownership of their own premarital, pre-partnership property into any form of joint ownership in which Debtor was holder of an undivided interest. This Court has concluded that the members of a partnership may agree to conduct partnership business without necessarily transferring individual property into joint or partnership ownership, and thereafter carry on the business of the partnership using that individual property. *In re Schyma*, 68 B.R. at 61–62. So it is here. When Debtor commenced this case, Betty still held full ownership of all of her premarital equipment subject to the Bank's security interests, and Debtor had no ownership interest in that equipment arising from his legal relationship with her.

## B. Applicability of 11 U.S.C. § 362(a).

█ The commencement of a bankruptcy case operates as a stay of "any act to create, perfect, or enforce any lien against property of the estate," and "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case ..." 11 U.S.C. § § 362(a)(1), (4) and (5). The scope of the bankruptcy estate is extremely broad, and includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *In re Schauer*, 62 B.R. 526, 529 (Bankr.D.Minn.1986). However, in order for property to pass into a bankruptcy estate—and then to be subject to the protections of the automatic stay against creditor action—the debtor must have had an interest in that property as of the commencement of the bankruptcy case. Here, the Court has concluded that Debtor had no legally-cognizable interest in the farming equipment and livestock subject to the Bank's security interests which had been Betty's premarital property and which continued to be her separate property during the course of the marriage and their partnership. That property did not pass into Debtor's estate in this Chapter 12 case, it thus was not protected by the automatic stay of § 362(a), and the Bank therefore was not restrained and enjoined from en-

---

**9.** While under Minnesota law a spouse, upon marriage, succeeds to an inchoate spousal interest in pre-marital real property of the other spouse which must be transferred upon conveyance by joint deed—*see* MINN.STAT. § 507.02—he or she does not automatically do so for personal property. *See* MINN.STAT. §§ 518.54, subd. 5 ("nonmarital property" for purposes of property division in dissolution of marriage proceeding means property acquired by either spouse before the marriage) and 518.58 (upon dissolution, court shall make a just and equitable division of marital property and may apportion nonmarital property only to avoid unfair hardship to a party).

forcing its security interests in that property via the state court replevin proceeding.

### III. CONCLUSION.

On the basis of the foregoing analysis, it is clear that the Bank was not prohibited by the pendency of Debtor's Chapter 12 case from enforcing its security interests as against collateral owned by Betty. In the interests of clarity, the Court's May 22, 1987 Order specifically described those items of equipment which it has found to have continued to be Betty's separate property, based on Debtor's testimony and upon the enumeration in "Deposition Exhibit 11."[10]

■ Debtor's responsive motion requests this Court to "vacate" the state court's replevin judgment, as having been entered in violation of 11 U.S.C. §§ 362(a) or 1201. Because the Court has determined that the Bank's resort to its state-court remedies did not violate bankruptcy law, it has denied this motion. In any event, this Court could not have granted the relief requested in Debtor's motion. The replevin proceedings were not under this Court's jurisdiction when the motion was made. This Court cannot "vacate" a judgment in state-court proceedings, related to a pending bankruptcy case, as it does not sit as a state court.[11] Had the Bank in fact obtained its state-court relief in violation of the stay, the correct procedural vehicle to bring the issue before this Court would have been a motion or an adversary proceeding seeking an order declaring that the creditor's action was voided. *See, e.g., In re Oliver*, 38 B.R. 245 (Bankr.D.Minn. 1984); *Landmark v. Schaefbauer*, 41 B.R. 766 (Bankr.D.Minn.1984).

---

**10.** In making this finding, the Court has used Debtor's testimony at the Meeting of Creditors in this case, which explained the significance of the markings on Deposition Exhibit 11 to the ownership issue. Debtor was under oath at the Meeting of Creditors and was obligated under penalty of perjury to respond truthfully to questions propounded to him. The Court does not attach credibility to Debtor's testimony at either the Bank's Rule 2004 examination or the hearings on these motions, as that testimony had the self-serving effect of incrementally increasing Debtor's claims to sole or joint ownership of items he had previously alleged to be Betty's sole property. Between the Meeting of Creditors and the later testimony, Debtor had had too much opportunity to review the effect of his earlier testimony on substantive issues in the case to support a conclusion that the later testimony was given with more candor and was entitled to more weight than the former. Though testimony at Meetings of Creditors is used primarily for administrative rather than judicial purposes, this Court believes it must promote full, candid disclosure at Meetings of Creditors, toward the goal of fostering expeditious administration on the basis of trustworthy testimony. The conclusion reached here will, not coincidentally, promote this goal.

**11.** At a far stretch, one could acknowledge that Debtor could have removed the replevin proceedings to this Court under 28 U.S.C. § 1452, and then moved this Court to vacate the judgment. However, state-court replevin proceedings involving a debtor in bankruptcy are only "related proceedings," subject to mandatory abstention under 28 U.S.C. § 1334(c) in the event of removal to the Bankruptcy Court. *In re Borchardt*, 56 B.R. 791, 793–94 (D.Minn.1986), *aff'd*, 803 F.2d 948 (8th Cir.1986). The dilatoriness of such purported removals was criticized appropriately by both the District and Circuit Courts in *Borchardt*. *See* 56 B.R. at 794 and 803 F.2d at 949–50.