## In re ADVANCE–UNITED EXPRESSWAYS, INC., Debtor.

### Bankruptcy No. 3–87–2869.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

June 10, 1988.

Brian F. Leonard, O'Neill, Burke, O'Neill, Leonard and O'Brien, St. Paul, Minn., for debtor.

John C. Thomas, Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., and Thomas Nyhan, Chicago, Ill., for Central States Pension Funds.

Michael McGrath, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for Unsecured Creditors Committee.

Diane D. Malfeld and Thomas O. Kelly, III, Dorsey & Whitney, Minneapolis, Minn., for LLT Finance Lease.

## ORDER OVERRULING OBJECTIONS TO CONFIRMATION OF DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on April 15, 1988, for hearing on confirmation of Debtor's plan of reorganization. Debtor appeared by its attorney, Brian F. Leonard. LLT Finance Lease, Inc. ("LLT") appeared by its attorneys, Diane D. Malfeld and Thomas O. Kelly, III.

Debtor's Unsecured Creditors Committee appeared by its attorney, Michael F. McGrath. Central States, Southeast and Southwest Areas Pension and Health and Welfare Funds (collectively "Central States") appeared by their attorneys, John C. Thomas and Thomas C. Nyhan. Other appearances were as noted in the record. The Court considered three objections to confirmation, those interposed by Martha June Rawdon Hawkins, a former employee; the County Treasurer of Douglas County, Nebraska; and LLT. The Court entered Findings of Fact and Conclusions of Law on the record in disposition of Hawkins's and Douglas County's objections to confirmation pursuant to FED.R.CIV.P. 52(a), and took LLT's objection under advisement subject to post-hearing briefing by counsel. Upon LLT's objection, Debtor's plan, the record made at the confirmation hearing, and counsel's pre- and post-hearing briefs, the Court makes the following order.

Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in this Court on September 25, 1987. Before its bankruptcy filing, Debtor was a major interstate freight hauler, operating in an 18–state area in the Midwest and Southwest. Most or all of Debtor's work force was unionized. The post–1980 deregulation of the trucking industry substantially contributed to the financial difficulties which led to Debtor's bankruptcy filing.

From the moment of its bankruptcy filing, Debtor openly manifested its intention to liquidate under Chapter 11. Within days after its filing, and in cooperation with its major secured creditors, it terminated all freight-hauling operations, laid off the great majority of its employees, collected all of its rolling stock into several of its terminals, and arranged for substitute hauling of freight in transit. With the support of its secured lenders, Debtor conducted auction sales of all of its rolling stock and other tangible personal property within 60 days of its bankruptcy filing, satisfying its largest secured claims with the proceeds of sale. It has undertaken to sell the four terminal locations which it owned, currently having closed the sale of one, finalizing the sale of another, and mar-

keting the other two. It is taking steps to sell its various operating authorities, and has been aggressively collecting its accounts receivable. Its work force has been reduced to seven employees, and will be reduced to none by mid-summer, 1988.

On its face, Debtor's Chapter 11 plan is a simple liquidation plan. *See* Debtor's First Plan of Reorganization, Article VIII; Debtor's First Amended Disclosure Statement, Section X. Debtor proposes to sell its remaining real and personal property, to collect remaining accounts receivable, and to hire an agent to audit and collect freight undercharges made out of conformity with Debtor's published Interstate Commerce Commission tariffs, as well as to promptly reduce all other non-cash assets to cash. The plan sets forth six classes of secured claims (one of which has been satisfied already via sale of its collateral) and four classes of unsecured claims. Debtor presently is challenging the asserted secured status of the claims of Marian A. Wines and Firestone Tire & Rubber Corporation, and recently settled its challenge to the secured status of Central States. The various classes of unsecured claimants will receive distribution from the estate according to fixed priorities. The plan proposes to pay employee wage and vacation-pay claims, employee benefit-plan contribution claims, tax claims, and unsecured claims from unencumbered assets in that order, roughly corresponding to the priorities established in 11 U.S.C. §§ 507 and 726(a). Holders of equity security interests would be paid any surplus remaining after payment of all allowed secured and unsecured claims.

Practically speaking, through its Chapter 11 plan Debtor proposes to effect the same distribution to creditors which a trustee in bankruptcy would accomplish through liquidation in a Chapter 7 case.

LLT has objected to confirmation of Debtor's plan on the ground that it does not meet the "best interests of creditors" test of 11 U.S.C. § 1129(a)(7)(A)(ii). That provision requires that any confirmed Chapter 11 plan provide that a member of an impaired class "receive or retain under

the plan on account of such claim ... property of value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 ... on such date ..." Because Debtor is liquidating under its Chapter 11 plan, LLT's objection does not require the value comparison—between the liquidation value of the debtor's non-exempt assets and the present value of a stream of future plan payments—that is usually required under the "best interests of creditors" test. *See, e.g., In re Schyma*, 68 B.R. 52, 59–62 (Bankr.D.Minn.1985) (applying identical language from 11 U.S.C. § 1325(a)(4)).

Rather, LLT's objection is prompted by the circumstance that Debtor is seeking this Court's approval of its liquidation through Chapter 11 before the fixing, liquidation, and allowance of Central States's claims. Those claims are based on Debtor's alleged "withdrawal liability" under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, located at 29 U.S.C. § 1381 *et seq.*, and/or Debtor's collective bargaining agreement with the International Brotherhood of Teamsters.[1] LLT holds a major unsecured claim, in excess of $590,000.00. It has voted to reject the plan and objects to confirmation out of a concern that Debtor's use of Chapter 11—rather than Chapter 7—to conduct its liquidation may substantially reduce the amount of LLT's distribution as an unsecured creditor, if it is later determined that the "cap" on "withdrawal liability" established by 29 U.S.C. § 1405(b) is unavailable to an employer-debtor nominally "reorganizing" under Chapter 11. Central States does not share LLT's uncertainty about the applicability of the "cap" provision and has acknowledged that "a formal Chapter 7 proceeding is not a prerequisite to the application of ... 29 U.S.C. § 1405(b)." Position Paper of the Central States, Southeast and Southwest Areas Pension Fund, at 3 (filed on April 25, 1988).

LLT's concern is borne of an excess of caution and is not supported by 29 U.S.C. § 1405(b) and its legislative history. The "withdrawal liability" provisions of Title 29, including 29 U.S.C. § 1405, were added to ERISA by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub.L. No. 96–364, 94 Stat. 1208 (1980). MPPAA was enacted to protect and strengthen employee pension plans which are funded by multiple employers, in response to perceived deficiencies in ERISA. *Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980*, 126 CONG.REC. 20189, 20192–3 (1980) (*"Joint Explanation"*); *Granada Wines, Inc. v. New England Teamsters and Trucking Indust. Pension Fund*, 748 F.2d 42, 43 (1st Cir.1984). Toward this goal, it imposes a "withdrawal liability" on an employer which terminates its participation in such a plan, requiring the employer to make a lump-sum contribution to the plan in order to fund the otherwise-unfunded future liability of the plan to pension recipients employed by the withdrawing employer. *See* 29 U.S.C. §§ 1381–1382, 1399.

In enacting MPPAA, however, Congress apparently recognized the likelihood that a withdrawing employer might be financially distressed, might be in the process of winding up its business and/or liquidating its assets and debts, and might have numerous other creditor-claimants against its assets. To mitigate prejudice to such other creditors, Congress enacted the "cap" provision of 29 U.S.C. § 1405(b), which reduces the dollar-amount of such "withdrawal liability" by 50 percent or more "[i]n the case of an insolvent employer undergoing liquidation or dissolution ..." At least one court has concluded that the "cap" provision of 29 U.S.C. § 1405(b) is not available

---

**1.** As noted by counsel for Central states in a "Position Paper" filed at the Court's request, it may be that only one of the two employee-benefit funds collectively referred to herein as "Central States"—the Pension Fund—is subject to ERISA. If this is the case, the liquidation of the claim of the Health and Welfare Funds will not be governed by that statute. This order does not finally determine the applicability of ERISA to either Fund's claim, and any reference to "Central States" and/or its/their claim(s) is only to the claimant(s) and claim(s) subject to ERISA.

to a Chapter 11 debtor proposing to remain in business under a reorganization plan. *See Granada Wines, Inc. v. New England Teamsters and Trucking Indust. Pension Fund, supra.* Acknowledging that a debtor could liquidate under Chapter 11,[2] the *Granada Wines* Court concluded that the debtor there was not proposing to do so and, therefore, could not invoke 29 U.S.C. § 1405(b) to justify its plan proposal to separately classify a claim arising on account of its pension fund withdrawal liability and to reduce the percentage distribution factor to be applied to the face amount of that claim to one-half of the percentage to be paid to other general unsecured claims. 748 F.2d at 46. The *Granada Wines* Court noted that Congress may have intended that the "cap" provision apply in a bankruptcy liquidation under either Chapter 7 or Chapter 11, but it declined to rule on the question because the facts presented to it did not require it to do so. 748 F.2d at 45.

LLT fears that the holding in *Granada Wines* might lead to the conclusion that any debtor self-liquidating under a chapter of the Bankruptcy Code primarily intended for the rehabilitation of operating businesses is not "undergoing liquidation" within the meaning of 29 U.S.C. § 1405(b). The legislative history to MPPAA belies this concern:

> Under the bill, an insolvent employer undergoing a liquidation or dissolution is always liable for an amount equal to 50 percent of his normal withdrawal liability ... *To qualify for this rule, an insolvent employer need not undergo a formal liquidation or dissolution. It must, however, be insolvent and wind up its business affairs.*

*Joint Explanation* at 20195 (emphasis added). The test under 29 U.S.C. § 1405(b) is more a factual than a legal one; the focus is on the current status of the employer's business operations, and on whether the withdrawing employer will remain in business—and not on the nominal classification of the legal remedy which it may be using to wind up its operations in an orderly fashion. If the employer-participant is in bankruptcy, is insolvent, and is winding up its business operations, it need not be doing so under Chapter 7 rather than Chapter 11.[3] *Apparent accord, In re Uiterwyk Lines (West Africa) Ltd.,* 73 B.R. 62 (Bankr.M.D.Fla.1987).[4]

LLT does not dispute that Debtor has terminated its business operations and is in the latter stages of winding up all of its affairs. It necessarily follows that Debtor is not barred merely by virtue of its status as a debtor liquidating under Chapter 11 from invoking 29 U.S.C. § 1405(b) in its objection to Central States's filed claim. It then follows that, were Debtor being liquidated under Chapter 7, LLT—and all other general unsecured claimants—would be no better off as against Central States in their claim to a share of Debtor's unencumbered assets. As a result, LLT's objection must be overruled.[5]

IT IS THEREFORE ORDERED:

1. That the objection of Martha June Rawdon Hawkins to confirmation of Debtor's First Amended Plan of Reorganization is overruled.

2. That the objection of the County Treasurer of Douglas County, Nebraska to

---

**2.** As this Court has done; *see In re Economy Cab & Tool Co., Inc.,* 44 B.R. 721, 725 at n. 2 (Bankr. D.Minn.1984).

**3.** The quoted legislative statement even suggests that a withdrawing employer need not be winding up via a formal legal proceeding under the Bankruptcy Code or under state insolvency or corporate-dissolution statutes.

**4.** The sole issue addressed in *Uiterwyk Lines* was whether the Chapter 11 debtor there was "insolvent" within the meaning of 29 U.S.C. § 1405(d)(1). The *Uiterwyk Lines* Court assumed without discussion or mention that the "cap" provision could be asserted by a Chapter 11 debtor. The opinion was silent as to whether the debtor's plan was an operating or a liquidation plan.

**5.** The present ruling is limited to the narrow question presented on LLT's objection to confirmation. All other factual and legal issues as to Debtor's eligibility for the "cap" of 29 U.S.C. § 1405(b)—as well as the question of whether this Court is the proper forum to determine Debtor's "withdrawal liability"—are preserved until they are properly presented on Debtor's objection to Central States's filed claim.

confirmation of Debtor's First Amended Plan of Reorganization is overruled.

3. That the objection of LLT Finance Lease, Inc., to confirmation of Debtor's First Amended Plan of Reorganization is overruled.